UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                          Crim. No. 2:06-CR-131

Spencer Durham


## REPORT AND RECOMMENDATION
(Docs. 72 and 75)

Spencer Durham, proceeding pro se, has filed a Motion pursuant to 28 U.S.C. §

2255 seeking to vacate, set aside, or correct a sentence imposed upon him on December

22, 2008.  (Docs. 72, 75.)  Durham was convicted following his guilty plea to one count

of obstruction of mail in violation of 18 U.S.C. § 1702, and sentenced by Chief United

States District Judge William K. Sessions III to time served, to be followed by a three-

year term of supervised release, plus a mandatory special assessment of $100 and a

restitution order in the amount of $4,981.  No direct appeal of this sentence was pursued.

In the instant Motion, Durham does not seek to vacate his plea of guilty to the obstruction

of mail count.  Rather, he merely attacks his sentence, his attorney's failure to file a

notice of appeal of that sentence, and the denial of his efforts to represent himself.  For

the reasons explained below, I recommend denying Durham's Motion.

I.     **Procedural History**

A.     **Pre-Trial Proceedings**

Durham's time served sentence arises from Durham's fifth federal conviction since 1995 for mail theft and related offenses, including two prior convictions in this Court.  The records of this Court reveal the following events.

In 2004, Durham was convicted of possession of stolen mail in the United States District Court for the Northern District of Illinois.  (Presentence Investigation Report ("PSR"), ¶ 67.)  As a consequence of that conviction, on May 25, 2004, Durham was sentenced to thirty-seven months imprisonment and a three-year term of supervised release.  (*Id.*)  In 2005, Durham was convicted of theft/receipt of stolen mail in the United States District Court for the Northern District of West Virginia, where he received another thirty-seven month sentence, minus time served on the Northern District of Illinois sentence, to be served concurrent to the Illinois sentence.  (*Id.* at ¶ 68.)  Upon completion of the West Virginia sentence, Durham's post-release supervision was transferred to the Northern District of New York.  (*Id.*)  On December 6, 2005, Durham commenced his term of supervised release in the Northern District of New York.  (*Id.*)

On June 30, 2006, Durham was convicted of forgery in Kansas state court, and sentenced to fourteen months imprisonment, to be served consecutive to his federal sentence for the West Virginia offense.  (*Id.* at ¶ 69.)  On April 17, 2007, following completion of his Kansas state sentence, Durham was arrested for violating his federal supervised release conditions, and on July 24, 2007, was sentenced in the United States

District Court for the Northern District of New York to twenty-four months imprisonment, with an anticipated release date of January 13, 2009. (PSR, ¶ 68.)

Meanwhile, as Durham was serving his Kansas state sentence, on November 29, 2006, the instant case commenced when an Indictment was filed in this District charging him with obstruction of mail in violation of 18 U.S.C. § 1702 (Count 1), and bank fraud in violation of 18 U.S.C. § 1344 (Count 2).[1] (Doc. 1.) Thereafter, a warrant was issued for Durham's arrest and lodged as a detainer against his release from the Kansas state authorities. (PSR, ¶ 2.) The Vermont Indictment was based in part on Durham's theft of a Vermont state tax refund check in the amount of $1.15 from a rural Vermont mailbox on April 3, 2006. Durham altered the check to create a counterfeit check in the amount of $4,981.52, and on April 19, 2006, the check was deposited into a Bank of America account in Kansas which was traceable to Durham.

On April 14, 2008, a Writ of Habeas Corpus *Ad Prosequendum* was issued, permitting the transfer of Durham to answer the pending Vermont Indictment. (Doc. 15.) On April 17, 2008, while still serving his sentence on the Northern District of New York violation, Durham made an initial appearance in this Court before Magistrate Judge Jerome J. Niedermeier. (Doc. 16.) At the hearing, Durham was represented by Assistant Federal Public Defender ("AFPD") Robert Fellrath of the Office of the Federal Public Defender. Durham was arraigned on the Indictment, entered a plea of not guilty, and was ordered detained pending trial. (*Id.*; see also PSR, ¶ 4.)

---

[1] Durham also sustained two earlier convictions for federal mail theft in the District of Vermont based on criminal conduct occurring in 1995 and 1999.

On May 5, 2008, acting pro se, Durham filed a Motion to Proceed Pro Se. (Doc. 21.) Accordingly, on May 22, 2008, AFPD Fellrath filed a Motion to Withdraw as counsel. (Doc. 24.) On June 16, 2008, a hearing was held before Chief Judge Sessions on both Motions. (Docs. 29, 81.) At the hearing, Durham stated that, while AFPD Fellrath had been "more than helpful" and "ha[d] done everything . . . asked [of] him[,]" Durham just "d[id]n't trust a court-appointed attorney." (Doc. 81, p. 3.) Chief Judge Sessions thereupon engaged in a thorough inquiry of Durham which included a careful explanation of the challenges an accused faces when he wishes to represent himself. Among other things, the Chief Judge ascertained that Durham was charged with a "very serious offense" and "has had mental health issues [(presumably including Durham's bi-polar disorder and anti-social personality disorder, referenced in ¶ 91 of the PSR)] in the past." (*Id.* at p. 8.) The Chief Judge also noted that Durham's education level was ninth grade and that he had no legal training, but stated, "that's not the key element, no training." (*Id.*) Finally, the Chief Judge noted that Durham "ha[d] gone on and off as to whether or not he wishe[d] representation." (*Id.*) Considering all these factors, Chief Judge Sessions denied Durham's request to represent himself, concluding that he "would be doing an injustice to [Durham] by permitting [him] to represent [him]self." (*Id.* at p. 9.)

Notwithstanding the denial of Durham's request to represent himself, the Chief Judge granted AFPD Fellrath's Motion to Withdraw, stating his intent to appoint "private counsel, whose responsibility . . . is to [Durham] and [Durham] alone," and asked Durham to meet with that counsel. (Doc. 81, p. 8.) The Court further advised Durham

4

that if he had "substantial difficulties somewhere down the road" and could demonstrate that he could capably represent himself in the trial of this matter, Durham should so advise the Court. (*Id.* at p. 9.) In response to the Court's inquiry as to when Durham would want to meet with his new private counsel, Durham stated, "I have gotta for the record object." (*Id.* at p. 10.) Nonetheless, the Court appointed Attorney David Watts, an experienced member of this Court's CJA panel, to represent Durham.

On November 13, 2008, Durham again asserted his desire to represent himself, this time during a hearing on his Motion for Pretrial Release. (Doc. 82.) Approximately midway through the hearing, Attorney Watts reported that Durham did not wish for Watts to represent him any further, but rather, Durham wished to represent himself. (*Id.* at p. 25.) Chief Judge Sessions denied the request, stating, "We are on the verge of trial at this point. You have been representing [Durham] extraordinarily ably, and you can't switch right on the verge of trial." (*Id.* at pp. 25-26.) In fact, trial had been scheduled to begin approximately one month from the date of the hearing, in December 2008. (*Id.* at p. 2.)

### B. Change of Plea

Several pretrial motions were filed, including, among others, Durham's Motion for Pretrial Release on Conditions and the Government's Motion for Admission of Evidence Pursuant to Rule 404(b). (Docs. 40, 44.) The November 13, 2008 hearing (referenced above) was held to address these Motions. (Doc. 82, p. 2.) With respect to Durham's Motion for Pretrial Release, Attorney Watts advised the Court that it was "reasonably likely" that the case would be resolved that day. (*Id.*) The Court and Attorney Watts then engaged in an extensive discussion about whether Durham would receive custodial

credit for the time he spent in pre-trial detention on the Vermont charge while receiving similar credit for the Northern District of New York charge. (*Id.* at pp. 2-16.) Ultimately, despite Attorney Watts' request for Durham's release pending either trial or sentencing, Chief Judge Sessions denied the Motion. The Court explained that it would not order Durham released until specific release conditions, including treatment and an appropriate residence, were in place. (*Id.* at pp. 21-24.)

Later in the hearing, the Court turned its attention to the Government's in limine motion, and heard the Government's Rule 404(b) argument. Rather than respond to this argument, however, Attorney Watts announced that, although Durham "had hoped to have a higher level of certainty in terms of his release date," he was "ready to proceed with a change of plea," and he wished to enter a plea of guilty. (Doc. 82, pp. 27, 37.) Accordingly, on November 13, 2008, a written plea agreement was executed and filed with the Court. (Doc. 55.) Chief Judge Sessions thereupon conducted a change of plea proceeding which comported with Rule 11 of the Federal Rules of Criminal Procedure. (Doc 82, pp. 32-48.) The Chief Judge found that Durham's plea of guilty to the obstruction of mail charge had a factual basis, was free of coercive influence, and was competently and voluntarily made with full knowledge of the charges against Durham and the consequences of his plea. (*Id.* at p. 48.) A presentence report was ordered in anticipation of an expedited sentencing. (*Id.*)

###    C.    Sentencing

A PSR was prepared, and on December 22, 2008, Durham appeared for sentencing. As of that date, Durham had been in federal custody for the Vermont

Indictment for approximately eight months (April 17, 2008 through December 22, 2008). The PSR reflected an advisory guideline imprisonment range of twenty-four to thirty months based in part on the conclusion that the offense involved the loss of more than $10,000. (PSR, ¶¶ 43, 120.) After reviewing the PSR's calculation for this guideline, however, Chief Judge Sessions accepted a stipulation of the parties, as stated in the Plea Agreement, that the loss involved in the offense conduct was "less than $5,000.00." (Doc. 55, p. 6; Doc. 83, p. 21.) This finding reduced the sentencing guideline offense level calculation by four levels. Chief Judge Sessions carefully explained his sentencing guideline calculation, concluding that the advisory guideline imprisonment range was twelve to eighteen months, and not twenty-four to thirty months, as stated in the PSR. (Doc. 83, pp. 21-23.) No objection to this conclusion was advanced. Considering the sentencing guidelines and Durham's time served on the Kansas and New York sentences, the Court imposed a below-guidelines sentence of "time served" (totaling approximately eight months, as noted above), "followed by a three-year term of supervised release." (*Id.* at p. 23.)

## II.     The Instant Motion

On December 9, 2009, Durham filed his initial Motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Doc. 72.) Durham argues that: (1) his sentence is "illegal" because a supervised release term may not be imposed on a time served sentence; (2) the Judgment is incomplete, as it fails to state any reasons why the sentence is "below [the] guidelines;" and (3) the Court erred at sentencing by not "calculating and identifying the applicable Sentencing Guidelines range" and by "failing

to state the reasons for his sentence in open court." (*Id.* at pp. 4-5.) Approximately one week later, on December 17, 2009, Durham filed an amendment to his Motion, adding claims of: (1) ineffective assistance of counsel based on his counsel's alleged failure to file a notice of appeal, and (2) denial of his Sixth Amendment right to represent himself prior to his guilty plea. (Doc. 75.) Taken together, the Motion and amendment make clear that Durham is not attacking his plea, but rather, asks only that the Court vacate his December 22, 2008 sentence, and re-sentence him, permitting him to appeal his time served sentence. (Doc. 72, p. 7; Doc. 75, p. 2.)

For the reasons explained below, Durham is factually wrong in many of his assertions, and his arguments do not withstand legal scrutiny. Therefore, I recommend that his Motion, as amended, be denied.

## III. Standard of Review

28 U.S.C. § 2255 is intended to remedy fundamental defects in a criminal prosecution. *United States v. Addonizio*, 442 U.S. 178, 185 (1979). A court may grant relief under this section only for constitutional errors, lack of jurisdiction, or an error of law constituting a fundamental defect which inherently results in a complete miscarriage of justice. *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996). The Supreme Court has defined a "miscarriage of justice" as a claim of actual innocence. *See United States v. Olano*, 507 U.S. 725, 736 (1993).

Section 2255 "may not be used as a substitute for a direct appeal." *Marone v. United States*, 10 F.3d 65, 77 (2d Cir. 1993) (citing *United States v. Frady*, 456 U.S. 152, 165 (1982)); *see United States v. Munoz*, 143 F.3d 632, 637 (2d Cir. 1998). Where a

defendant has procedurally defaulted a claim by failing to raise it on direct appeal, the defendant must demonstrate either "cause" for failing to raise the issue and "prejudice" resulting therefrom, or that he is "actually innocent." *Fountain v. United States*, 357 F.3d 250, 254 (2d Cir. 2004) (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)); *United States v. Pipitone*, 67 F.3d 34, 38 (2d Cir. 1995). "Cause" for failing to raise an issue on appeal "must be something external to the petitioner, something that cannot fairly be attributed to him." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). Stated differently, the "cause" standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts to raise the claim . . . ." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (citation omitted). "Prejudice" requires a showing that the alleged error "so infected the entire trial that the resulting conviction violates due process." *Frady*, 456 U.S. at 169.

Despite being advised by the Court first at the November 13, 2008 plea hearing that he would be "waiving . . . [his] right to appeal the merits of [his] case" (Doc. 82, p. 38), and later at the December 22, 2008 sentencing hearing that he had a "right to appeal [his] sentence" and that a "[n]otice of appeal . . . must be filed within 10 days of the date judgment is entered on the docket" (Doc. 83, p. 27), Durham pursued no appeal of his sentence. Therefore, each of his claims – excepting his ineffective assistance of counsel claim – is procedurally barred. Even if not procedurally barred, however, Durham's claims lack substantive merit, as he fails to allege an error in his sentencing, much less an error creating a "fundamental defect which inherently results in complete miscarriage of justice," as required under § 2255. *Graziano*, 83 F.3d at 590.

As noted, Durham's ineffective assistance of counsel claim is not subject to the failure-to-appeal procedural bar discussed above, and such a claim may generally be raised for the first time on collateral review. *See Johnson v. United States*, 313 F.3d 815, 817 (2d Cir. 2002) ("claims of ineffective assistance of counsel generally are not procedurally barred"); *Billy-Eko v. United States*, 8 F.3d 111, 114 (2d Cir. 1993) (ineffective assistance claims are appropriately brought in § 2255 petitions even if overlooked on direct appeal because resolution of such claims often requires consideration of matters outside the record on direct appeal), *superseded by statute on other grounds as stated in Triestman v. United States*, 124 F.3d 361, 369, n. 8 (2d Cir. 1997). Nonetheless, Durham's ineffective assistance claim fails on its merits, as discussed below.

## IV. Analysis

### A. Imposition of Supervised Release Following Time Served Sentence

Durham argues that a supervised release term cannot be imposed on a time served sentence. This claim fails, given that: (a) 18 U.S.C. § 3583(a) permits courts, "in imposing a sentence to a term of imprisonment," to include as part of the sentence "a requirement that the defendant be placed on a term of supervised release after imprisonment;" and (b) the Second Circuit has made clear that the sentence of "time served" is "an unambiguous pronouncement of a specific term of imprisonment-the amount of time actually served," *United States v. D'Olivera*, 402 F.3d 130, 132 (2d Cir. 2005). As discussed above, when Durham was sentenced at the December 22, 2008 hearing, he had been in federal custody on the Vermont Indictment for approximately

eight months.  Therefore, his "time served" sentence included a term of eight months, which could be followed by a period of supervised release.

**B.    Sentencing Court's Statement of Reasons for Sentence**

Rule 32(k) of the Federal Rules of Criminal Procedure requires that a sentencing court "set forth" in the judgment of conviction "the plea, the jury verdict or the court's findings, the adjudication, and the sentence."  Although Chief Judge Sessions clearly included these items in the Judgment in this case (Doc. 65), Durham argues that the Court's "[s]tatement and reasons for sentencing was not complete."  (Doc. 72, p. 4.)  He further alleges that "the [j]udgment and commitment do[] not state reasons for . . . [w]hy sentence [was] below guidelines . . . ."  (*Id.*)  This claim fails for two principal reasons.

First, the transcript of the December 22, 2008 sentencing hearing reveals that Chief Judge Sessions plainly stated his reasons for imposing the sentence in precise detail.  (Doc. 83, pp. 21-29.)  Specifically, the Chief Judge explained that he would accept the parties' stipulation limiting the loss amount to under $5,000; that the Court's focus was on Durham's "reentry for the benefit of his three kids that are at home" and also for the potential benefit of Durham "reuniting" with his infant child; that the sentence range with respect to the sentencing guidelines was twelve to eighteen months; and that Durham was entitled to a downward adjustment pursuant to U.S.S.G. § 5G1.3 based on the fourteen months he had already served on the Kansas offense, which the Court found was directly related to the underlying offense in this case.  (*Id.* at 21-23.)  In addition, the Court released a "Statement of Reasons" which set forth its analysis of the

guidelines calculation, as well as the grounds for a departure under U.S.S.G. § 5G1.3(b). (*See* Doc. 87-1.)

Second, even assuming, *arguendo*, that there was some deficiency in the Court's statement of reasons for the sentence, the Supreme Court has held that a technical violation of Rule 32 does not amount to "a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure," and thus, is not cognizable on collateral review. *Hill v. United States*, 368 U.S. 424, 428-29 (1962) ("collateral relief is not available when all that is shown is a failure to comply with the formal requirements of . . . Rule [32]"); *see Basile v. United States*, 999 F.2d 274, 276 (7th Cir. 1993) ("[A] mere technical violation of Rule 32 cannot be corrected in a proceeding under § 2255."). Durham has failed to demonstrate that the claimed error is one of a "constitutional magnitude which had a substantial and injurious effect or influence on [his] guilty plea." *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

### C.   Sentencing Guidelines

In a related claim, Durham asserts that the Court erred "by not calculating and identifying the applicable sentencing guidelines range and by failing to state the reasons for his sentence in open Court." (Doc. 72, p. 5.) Durham provides no record reference for this claim. In fact, the claim is frivolous, as the record clearly demonstrates that Chief Judge Sessions engaged in a thorough sentencing guideline analysis at the December 22, 2008 sentencing hearing. (Doc. 83.) As discussed above, at that hearing, the Chief Judge

rejected the conclusion stated in paragraph 43 of the PSR that the offense level should be

based on a loss calculation of greater than $10,000, and instead accepted the stipulation

stated in paragraph 12(a) of the Plea Agreement that the loss calculation was less than

$5,000.  (Doc. 55, p. 6.)  This resulted in a four-level decrease in the offense level

provided in the sentencing-guideline calculation reflected in the PSR.  At one point in the

hearing, Chief Judge Sessions stated that the base offense level was ten, when in fact he

meant to state (and previously had stated) that the base offense level was six.  (Doc. 83,

p. 22.)  Nonetheless, the Chief Judge employed the correct analysis to reach the

sentencing range of twelve to eighteen months.  In relevant part, Judge Sessions stated:

> The most simple[] way of approaching this is to accept the stipulation of
> the parties, and so that means the offense level is at six.  There's a two-
> level increase for role in the offense; I believe that he was in charge of
> others.  A two-level reduction for acceptance of responsibility.  And then of
> course he has credit for the 14 months that he has already served.  So we
> are in a 12- to 18-month sentence range.  And so the Court finds as follows:
> The offense of obstructing correspondence, in violation of 18 USC, section
> 1702 occurred on or about April 3, 2006.  The guidelines apply.  The
> offense is found in 2H1.3.  The base offense level is 10.  No specific
> offense characteristics.  There's a two-level reduction – there's an increase
> of two levels for the defendant being a manager or supervisor.  And that is
> to eight. Two-level reduction for acceptance of responsibility to six.
> Defendant has 19 criminal history points, resulting in a criminal history
> category of six.  Range is 12 to 18 months.  The defendant, in relation to
> the offense in Kansas, has already served 14 months.

(*Id.* at pp. 22-23.)

Not only is Durham's assertion that the Court erred with respect to the sentencing

guidelines factually wrong, it is also not the type of claim which would warrant collateral

relief.  The Second Circuit has held:  "Insofar as claims regarding a sentencing court's

error in failing to properly apply the Sentencing Guidelines are neither constitutional nor

jurisdictional, we join several other circuits in holding that, absent a complete miscarriage of justice, such claims will not be considered on a § 2255 motion where the defendant failed to raise them on direct appeal." *Graziano*, 83 F.3d at 590. Durham did not file an appeal, and his sentencing guideline claim is neither constitutional nor jurisdictional, and does not involve a miscarriage of justice. Therefore, the claim fails.

### D. Ineffective Assistance of Counsel

Next, Durham contends that his counsel, Attorney Watts, provided ineffective assistance by failing to file an appeal despite Durham's claim of an express request that Watts do so. If true, Watts' failure to file a notice of appeal would constitute ineffective assistance of counsel. *Garcia v. United States*, Nos. 01 Cr. 945, 04 Civ. 6020 (RMB) (GWG), 2008 WL 683661, at *5 (S.D.N.Y. Mar. 14, 2008) (citing Fe*rnandez v. United States*, 146 F.3d 148, 149 (2d Cir. 1998) (per curiam) (ineffective assistance shown where counsel "ignor[ed] a defendant's explicit direction to file an appeal")).

Generally, the essence of an ineffective assistance of counsel claim is that counsel's unprofessional errors so upset the adversarial balance that the trial was rendered unfair and the verdict suspect. *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). In *Strickland v. Washington*, 466 U.S. 668, 687-91 (1984), the Supreme Court held that, in order to prevail on an ineffective assistance claim, a petitioner must establish that (1) he was deprived of reasonably competent representation; and (2) counsel's deficient performance prejudiced his defense. *Hernandez v. United States*, 202 F.3d 486, 488 (2d Cir. 2000) (citing *Strickland*, 466 U.S. at 687-91); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002). With respect to the petitioner's receipt of competent

representation, the court must "indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The Supreme Court held in *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) that the *Strickland* standard applies in cases like this, where the ineffective assistance claim is based on counsel's alleged failure to file a notice of appeal. *See Sarroca v. United States*, 250 F.3d 785, 787 (2d Cir. 2001). With respect to the first prong of the *Strickland* analysis, addressing the reasonableness of counsel's performance, the Court in *Flores-Ortega* stated: "We have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Flores-Ortega*, 528 U.S. at 477 (citing *Rodriquez v. United States*, 395 U.S. 327 (1969)). Moreover, in an earlier case, the Supreme Court held: "[W]hen counsel fails to file a requested appeal, a defendant is entitled to [a new] appeal without showing that his appeal would likely have had merit." *Peguero v. United States*, 526 U.S. 23, 28 (1999) (citing *Rodriquez*, 395 U.S. at 329-30).

Durham argues that he requested that Attorney Watts file an appeal on his behalf. Specifically, in his "Amended Petition under 28 U.S.C. § 2255," Durham claims that Watts "failed to file a notice of appeal *as requested* . . . ." (Doc. 75, p. 1.) In his "Reply to Government's Opposition," Durham further contends that he requested by letters dated December 22, 2008 and January 18, 2009 that an appeal be filed. (Doc. 88, p. 2.) In his "Reply to . . . Order of February 4, 2010," Durham asserts that "counsel[']s failure to file a notice of appeal and direct appeal are the only reason the defendant did not file an appeal . . . ." (Doc. 91, p. 2.) Additionally, Durham has submitted evidence, including

an Affidavit and supporting documentation, which he contends substantiates his assertion that he requested an appeal.[2]

Specifically, Durham's one-page Affidavit states that he mailed a letter to Attorney Watts on December 22, 2008, wherein he requested that Watts file a notice of appeal. (*See* Doc. 88-2, p. 2.) The Court has not been provided with a copy of this letter, and Attorney Watts does not confirm its existence. Durham further states in his Affidavit that, while Watts was on leave from his office, Durham "communicated with Mr. Gene White, an investigator from Mr. Watts['] office [] about the appeal." (*Id.*) Finally, Durham states that he again requested in a letter dated January 18, 2009 that Watts file a notice of appeal and/or an Anders brief. (*Id.*; *see also* Doc. 88-1, p. 2 ("I'm concerned that you have not yet filed a notice of appeal. I have communicated this to you through Mr. White. . . . If you feel there are no issues for appeal, then file an Anders brief.").)[3]

The statements made in Durham's Affidavit differ from those made in Attorney Watts' Affidavit. In the latter, Watts states that, following sentencing (on December 22,

---

[2] On or around March 5, 2010, the Court issued an Order soliciting from both sides additional materials, including affidavits, providing details about Durham's purported request for an appeal, including the manner, date, and place of such request. (Doc. 94.) *See, e.g., Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (holding that courts may expand the record on a prisoner's § 2255 motion, including soliciting and considering letters, documentary evidence, and, affidavits). That Order erroneously stated that Durham had "failed to offer any specific information beyond the bare allegations stated [in his Amended Petition and Reply to February 4, 2010 Order] with respect to his alleged request that Attorney Watts file an appeal." (Doc. 94, p. 3.) At the time that the Order was prepared, the Court was unaware of Durham's "Reply to Government's Opposition," which had been filed on February 2, 2010. (Doc. 88.) The Court has since reviewed that document and its attached Exhibits. Additionally, the Court has received and reviewed Durham's "Reply to the Court's Order of March 5, 2010" and its attached Exhibits (Doc. 95), as well as Durham's "Reply to Affidavit of David Watts, Former Attorney" (Doc. 104).

[3] Additionally, Durham has submitted a letter to Watts which is dated December 25, 2009. (*See* Doc. 88-1, p. 3.) Given its late date, the letter is of little significance.

2008), he met with Durham, and Durham indicated that "he was pleased with the sentence and did not ask that it be appealed." (Doc. 98, ¶ 3.) Watts further states that, "[a]t no time during the period up through my leaving for vacation on January 1, 2009 did Mr. Durham indicate that he wanted me to file an appeal in his case and I never advised him that an appeal had been filed." (*Id.* at ¶ 6.) Although Watts acknowledges in his Affidavit that Durham sent emails to Watts' office on January 4 and 7, 2009, respectively, wherein Durham stated that he "wish[ed] to appeal [his] case" (*id.* at ¶¶ 8, 10), Watts states that, thereafter, he spoke with Durham by telephone, and "confirmed with Mr. Durham that an appeal had not been filed on his behalf as he hadn't asked me to file one[,] and reviewed with [Durham] why I believed that there was no non-frivolous basis for an appeal" (*id.* at ¶ 11).

Watts further states in his Affidavit that Durham "indicated he accepted my reasoning[, and] did not indicate that he wanted to have an appeal filed despite this advice, did not say he wished I had filed an appeal, and did not ask me to file an appeal then." (Doc. 98, ¶ 11.) Finally, Watts' Affidavit asserts that, on January 14, Watts wrote a letter to Durham, confirming that no appeal had been filed on his behalf (*id.* at ¶ 12), and stating as follows: "I had not received a request that I file an appeal for you so I did not file [a] notice of appeal. In any case, I cannot conceive of any non-frivolous issue that could be raised on appeal in that you entered your plea based on a plea agreement that involved the Government dismissing the more serious felony in exchange for your plea to the five year felony obstruction of mail." (Doc. 98-9.) Attached to his Affidavit, Watts has submitted letters prepared by him to Durham and emails prepared by Durham

and White.  (*See* Docs. 98-1 through 98-10.)

Although Durham's and Watts' respective Affidavits conflict in some significant ways, they can be reconciled with respect to the basic facts.  The Affidavits indicate that, sometime after the December 22, 2008 sentencing hearing, Durham and Watts had a conversation wherein Durham advised Watts that he was "pleased" with his sentence, and did not ask for an appeal.[4]  (Doc. 98, Watts Aff., ¶ 3.)  On the date of the sentencing, however, Durham claims he sent a letter to Watts requesting that he file a notice of appeal.  (Doc. 88-2, Durham Aff.)  As stated above, Watts apparently did not receive that letter, and the Court has not been provided with a copy of it.  On January 1, 2009, Durham sent an email to Watts' office, which stated:  "Thank you for everything, hope you have a great New Year and a Great trip."  (Doc. 98, Watts Aff., ¶ 5, Ex. D.)  Given the content of such email, and the fact that it makes no mention of the alleged December 22 letter requesting an appeal, and also considering that such alleged letter has not been submitted to the Court in support of Durham's claim, I find the existence of the December 22 letter doubtful.

In any event, the Affidavits indicate that in early January, Durham sent multiple emails to Watts' office wherein he stated that he wished to appeal.  (Doc. 88-2, Durham Aff.; Doc. 98, Watts Aff., ¶¶ 8, 10, Exs. F, H.)  Soon thereafter, Watts telephoned Durham to discuss such emails, explaining to Durham why an appeal had not been filed;

---

[4] Watts states in his verified Affidavit that this conversation occurred when he "met with" Durham "[f]ollowing sentencing."  (Doc. 98, ¶ 3.)  Durham, on the other hand, states in his unverified Reply to Watts' Affidavit that he did not "meet" with Watts "[a]t [any] time following sentencing."  (Doc. 104, p. 1.)  Even accepting Durham's statement as true, the existence of the conversation described in Watts' Affidavit is credible and could have occurred via telephone; whether it occurred in person or by telephone is not relevant in this context.

Durham accepted Watts' reasoning and did not indicate that he still wished to proceed with an appeal.[5] (Doc. 98, Watts Aff., ¶ 11.) On January 14, 2009, Watts wrote a letter to Durham, confirming that no appeal had been filed on his behalf. (*Id.* at ¶ 12, Ex. I.) In response, on January 18, 2009, after the time to appeal had expired,[6] Durham wrote a letter to Watts, again requesting an appeal. (Doc. 88-2, Durham Aff.; Doc. 88-1, p. 2.) It is unclear whether Watts ever received this letter.

Taking the evidence as a whole, although Durham has submitted documents demonstrating that he requested an appeal, the evidence submitted by Attorney Watts demonstrates that, when Watts discussed the feasibility of an appeal with Durham, Durham backed off his requests. Furthermore, and most importantly, considering and balancing both Durham's and Attorney Watts' Affidavits and the supporting evidence, I find that Watts' Affidavit and evidence is credible and Durham's alleged demonstrations to counsel that he was interested in appealing are not plausible, given (a) Durham's guilty plea, which reduced the scope of potentially appealable issues and indicated that Durham sought an end to judicial proceedings; and (b) the beneficial results Durham achieved at sentencing, as discussed herein. *See Flores-Ortega*, 528 U.S. at 480. Therefore, I find that there was no timely request to file an appeal. *See, e.g., Garcia*, 2008 WL 683661, at

---

[5] In his Reply to Watts' Affidavit, Durham denies that he ever told Watts that he "did not want to appeal." (Doc. 104, p. 2.) I assign little weight to this statement, however, given that the Reply is unverified and an appeal would be entirely unreasonable and frivolous on these facts (for the reasons stated herein), while Watts' Affidavit is verified and the Court has no reason to doubt the statements contained therein.

[6] Under the applicable Rules of Appellate Procedure as they existed at the time of Judgment, given that Judgment was entered on December 23, 2008, the deadline for filing an appeal was January 8, 2009. *See* Fed. R. App. P. 4(b)(1)(A)(i) (amended 2009); Fed. R. App. P. 26(a)(1) (amended 2009).

*5 (where defense counsel's circumstantial account reflecting that defendant did not ask him to appeal was more credible than defendant's conclusory statement to the contrary, court found there was no request to file appeal).

Durham's failure to timely instruct Watts to file an appeal, however, "does not foreclose the inquiry as to whether counsel acted in a professionally unreasonable manner." *United States v. Gomez*, 644 F. Supp. 2d 362, 373 (S.D.N.Y. 2009) (citing *Flores-Ortega*, 528 U.S. at 479). "In those cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, . . . the question whether counsel has performed deficiently by not filing a notice of appeal is best answered by first asking a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal." *Flores-Ortega*, 528 U.S. at 478.

As noted above, Attorney Watts states in his Affidavit that he met with Durham "[f]ollowing sentencing." (Doc. 98, ¶ 3.) He does not, however, provide the date of such meeting, and thus it is unclear whether it happened prior to the appeal deadline. In fact, the only detail Watts provides about the meeting is that Durham "indicated he was pleased with the sentence and did not ask that it be appealed." (*Id.*) Even assuming this meeting happened, and happened prior to the appeal deadline, it is not apparent whether it could be considered a "consultation," based on the limited information provided. *See United States v. White*, Nos. 09 Civ. 6507 (DC), 07 Cr. 848 (DC), 2009 WL 3816840, at *2, fn. 3 (S.D.N.Y. Nov. 13, 2009) (quoting *Flores-Ortega*, 528 U.S. at 478) ("The Supreme Court has defined 'consult' in this context as 'advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to

discover the defendant's wishes.'")

Sometime in mid-January 2009, however, which was approximately one month after the sentencing hearing, it is clear that Watts consulted with Durham about filing an appeal, advising that "there was no non-frivolous basis for an appeal" and that "an appeal would have exposed [Durham] to unnecessary risk." (Doc. 98, Watts Aff., ¶ 11; *see also* ¶¶ 3b, 3, 12.) Soon after such consultation, Watts reiterated in a January 14, 2009 letter to Durham that he "[could not] conceive of any non-frivolous issue that could be raised on appeal." (Doc. 98-9.) Durham does not specifically respond, under oath, to these statements of counsel.[7] Therefore, the Court has before it credible and virtually unchallenged evidence demonstrating that Watts did in fact consult with his client about an appeal. Even this evidence, however, does not indicate that such consultation occurred prior to the appeal deadline of January 8, 2009. In any event, I find that Watts had no constitutional duty to consult with Durham regarding the filing of an appeal.

In *Flores-Ortega*, the Supreme Court held that counsel has a duty to consult with his or her client about an appeal only "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480. In determining whether a rational defendant would want to appeal, the Supreme Court stated:

---

[7] As stated in a prior footnote, Durham's statement that, "[a]t no time did I ever tell [Watts] I did not want to appeal" was made in an unverified "Reply," rather than in a verified affidavit. (Doc. 104, p. 2.)

Although not determinative, *a highly relevant factor . . . will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings.*  Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights.  Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Id.* (emphasis added).

Applying this analysis here, I have no "reason to think" that a "rational defendant would want to appeal" on these particular facts.  *Flores-Ortega*, 528 U.S. at 480.  First, Durham entered a guilty plea, thus limiting the issues on appeal and suggesting that he desired an end to judicial proceedings.  At the November 13, 2008 change of plea hearing, Durham was specifically asked by Chief Judge Sessions if he understood that he would be "waiving . . . [his] right to appeal the merits of [his] case," and he responded, "Yes, your Honor."  (Doc. 82, p. 38.)  Second, despite the PSR's recommendation of an advisory guideline imprisonment range of twenty-four to thirty months and the Chief Judge's finding that the advisory guideline imprisonment range was twelve to eighteen months, Durham received an extremely lenient prison sentence of only eight months time served for his fifth federal felony conviction, a sentence well below the guidelines.  If Durham were to successfully appeal this sentence and the case was remanded for re-sentencing, the Government would likely argue for a much higher sentence and Durham would risk trading the lenient time served sentence for a harsher one which could include a lengthy prison term.

Third, for the various reasons discussed herein, Durham would have lacked any meritorious grounds for appeal. As noted, he received an exceptionally favorable sentence which was well below the advisory guidelines range, benefitting greatly by the Court's downward adjustment.[8] The Second Circuit has held that the extent of a discretionary downward departure from a sentencing guideline range is not appealable unless the departure was made in violation of the law or as a result of a misapplication of the guidelines. *United States v. Moe*, 65 F.3d 245, 251 (2d Cir. 1995); *United States v. Lawal*, 17 F.3d 560, 562 (2d Cir. 1994). Moreover, courts have refused to find ineffective assistance of counsel where, as here, the defendant received tangible benefits from the plea agreement negotiated by counsel. *Jimenez v. United States*, No. 99 CR. 984, 2001 WL 699060, at *5 (S.D.N.Y. Jun. 20, 2001); *see Panuccio v. Kelly*, 927 F.2d 106, 109 (2d Cir. 1998). Under the plea agreement, Durham received promises from the Government that (a) it would move to dismiss the Indictment's charge of bank fraud; (b) it would recommend that Durham be sentenced to a term at the low end of the guidelines range if the final offense level was four or above; (c) it would not seek an upward departure beyond the advisory guidelines range; and (d) it would agree that the loss in the case was less than $5,000, which resulted in a four-level reduction in the offense level provided in the PSR. (Doc. 55, pp. 3, 5-6.)

In sum, Durham has not shown that he instructed Watts to file a notice of appeal.

---

[8] Attorney Watts' effective representation of Durham may have been the cause of this downward adjustment. Both Chief Judge Sessions and Durham independently stated on separate occasions that Attorney Watts had effectively represented Durham in this matter. (*See* Doc. 82, p. 49, where Chief Judge Sessions stated: "Mr. Durham, . . . Mr. Watts has done quite a job for you here. And obviously this is much to your benefit."; *see also id.* at p. 46, where Durham responded affirmatively to the Chief Judge's inquiry as to whether he is "satisfied with the representation [Attorney Watts] ha[d] provided.")

Moreover, Watts had no constitutional duty to consult with Durham regarding an appeal. Therefore, Watts' failure to file a notice of appeal was not objectively unreasonable, and I recommend finding that Durham's claim of ineffective assistance of counsel fails under the *Strickland/Flores-Ortega* standard.

E.    **Denial of Pro Se Representation**

Finally, Durham contends that Chief Judge Sessions' denial of his pre-plea requests to proceed pro se in this matter violated his Sixth Amendment right of self-representation. In response, the Government argues that: (a) in light of his plea to the lesser of the two charges he faced and the below-guidelines sentence of time served, Durham cannot assert that his lack of self-representation prejudiced him; (b) Durham's knowing and voluntary guilty plea is a waiver of his pre-plea Sixth Amendment assertion of his right to self-representation; and (c) Durham did not unequivocally assert his desire to represent himself and abandoned his right to self-representation prior to entering a guilty plea. The Court agrees that Durham did indeed waive this argument by his plea of guilty.

It is well-established that a person accused of a crime has a Sixth Amendment right to self-representation, meaning a right "to make one's own defense personally." *Faretta v. California*, 422 U.S. 806, 819 (1975). This right to defend "is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 820. The right to proceed pro se "may be exercised by all criminal defendants who knowingly, voluntarily, and unequivocally waive their right to appointed counsel." *Johnstone v. Kelly*, 808 F.2d 214, 216 (2d Cir. 1986) (citing *Faretta*, 422 U.S. at 835-36). The Second

Circuit held in *Johnstone v. Kelly*, 808 F.2d at 218, that deprivation of the right to self-representation requires "automatic reversal of a criminal conviction." In that case, however, the defendant also exercised his Sixth Amendment right to trial by jury.

A pre-trial assertion of the right to self-representation is waived where, as in this case, the defendant knowingly and voluntarily pleads guilty to the crime charged. *See United States v. Moussaoui*, 591 F.3d 263, 279-80 (4th Cir. 2010) (rejecting defendant's claim that district court violated his right to effectively proceed pro se, and holding that, when a defendant pleads guilty, he waives all nonjurisdictional defects in the proceedings conducted prior to entry of the plea); *see also Blackledge v. Perry*, 417 U.S. 21, 29-30 (1974) ("[W]hen a criminal defendant enters a guilty plea, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."). This Court has previously considered and rejected the very claim Durham now asserts. In *Ploof v. Gorczyk*, No. 2:95-cv-206 (D. Vt. Apr. 24, 1996), the District Court adopted Magistrate Judge Jerome J. Niedermeier's Report and Recommendation, which held that a knowing and voluntary guilty plea waives any pre-plea Sixth Amendment assertions to the right of self-representation. The Report and Recommendation stated: "It is well-settled that a counseled and voluntary guilty plea bars all nonjurisdictional defects in a prior proceeding." *Id.*, Doc. 13, at pp. 9-10 (citing *Lebowitz v. United States*, 815 F.2d 879, 881 (2d Cir. 1989)).

*Ploof* involved facts similar to those at issue here. Specifically, in *Ploof*, although the defendant initially accepted assignment of counsel and entered a guilty plea, he later made a motion requesting permission to represent himself. Unlike Durham's request in

this case, Ploof's request to represent himself was initially granted. Soon thereafter, however, the state court in *Ploof* reassigned a public defender to represent the defendant, and approximately four months later, Ploof, with the assistance of the public defender, changed his plea to guilty pursuant to a plea agreement. Similarly, in this case, as discussed above, Durham initially accepted assignment of counsel, later requested to proceed pro se, and finally, after being assigned new counsel, entered a guilty plea.

The Court in *Ploof* noted that the defendant had not challenged the voluntary and intelligent nature of his guilty plea, and quoted a Supreme Court case for the proposition that "'a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.'" *Ploof*, No. 2:95-CV-206, Doc. 13, at pp. 10-11 (quoting *United States v. Broce*, 488 U.S. 563, 574 (1989)). In an unpublished opinion, the Second Circuit affirmed the District Court's decision in *Ploof*, concluding that, by pleading guilty, the defendant had waived his Sixth Amendment claim of self-representation. *Ploof v. Gorczyk*, 104 F.3d 356, at *2 (2d Cir. 1996). Additionally, the Second Circuit in *Ploof* re-stated the rule that "a counseled and voluntary guilty plea bars all non-jurisdictional defects in a prior proceeding." *Id.* (citing *United States v. Seybold*, 979 F.2d 582, 585 (7th Cir. 1992); *Lebowitz*, 815 F.2d at 881). In an earlier case, the Supreme Court discussed the reason for this rule:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not

within the standards set forth in *McMann* [*v. Richardson*, 397 U.S. 759, 770 (1970)].

*Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *see Brady v. United States*, 397 U.S. 742, 750 (1970); *Parker v. North Carolina*, 397 U.S. 790, 796 (1970).

Like the defendant in *Ploof*, Durham does not attack the voluntary and intelligent nature of his guilty plea.[9]  Moreover, although Durham asserts a claim of ineffective assistance of counsel, the basis for that claim is Attorney Watts' failure to file a notice of appeal; there is no suggestion that the counsel provided by Attorney Watts was deficient with respect to Durham's guilty plea.  In fact, Watts achieved great results for his client, and, as noted earlier, Durham responded affirmatively to Chief Judge Sessions' inquiry during the change of plea hearing as to whether he was "satisfied with the representation [Attorney Watts] ha[d] provided."  (Doc. 82, p. 46.)  Accordingly, because of his guilty plea, Durham has waived the issue of his right to represent himself.

In his "Reply to the Supplemental Response of the United States," in response to the Government's argument that he waived his right to self-representation, Durham cites two cases, *United States v. Matsushita*, 794 F.2d 46 (2d Cir. 1986) and *United States v. Arlt*, 41 F.3d 516 (9th Cir. 1994), for the proposition that a defendant's guilty plea has "no effect" on his claim that he was denied his right to self-representation.  (Doc. 99, p. 2.)  Given the above law, this claim is incorrect.  Moreover, the cited cases are inapposite, as they involved defendants who proceeded to trial after they were denied the

---

[9] Durham clearly knows how to make such an attack, as he unsuccessfully attacked the voluntary and knowing nature of his guilty plea in a § 2255 Motion filed in another case before this Court.  *See United States v. Durham*, No. 2:00-cr-27 (D. Vt. filed Mar. 16, 2000) (Doc. 33, p. 6; Doc. 41, pp. 25-31).

right of self-representation.  Here, in contrast, Durham entered a knowing and voluntary guilty plea and thus waived his Sixth Amendment rights.

## Conclusion

Based on the foregoing, I recommend that Durham's Motion to Vacate, Correct, or Set Aside Sentence (Docs. 72 and 75) be denied.

Dated at Burlington, in the District of Vermont, this 21st day of April, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation *within fourteen (14) days* after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all other parties, a written objection which shall specifically identify the portion(s) of the proposed findings, recommendations, or report to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule waives the right to appellate review of the District Court's order entered pursuant to this Report and Recommendation.  *See* Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a), and 6(d).